IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ZORAN ZUZA, | ) | |
| | ) | |
| | ) | |
| Plaintiff, in *Pro Se* | ) | |
| | ) | |
| v. | ) | Civil No. 1:14-cv-01099 |
| | ) | |
| OFFICE OF THE HIGH | ) | |
| REPRESENTATIVE *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

*PRO SE* PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS

Pro Se Plaintiff Zoran Zuza ("Plaintiff") respectfully submits this memorandum in

opposition to the motion to dismiss ("Motion") [DE # 4] of Defendants[1] Office of the

High Representative ("OHR"), Valentin Inzko ("Dr. Inzko") and Jeremy Ashdown

("Lord Ashdown") (collectively, "Defendants").

## I.  INTRODUCTION

Defendants' challenge to subject matter jurisdiction lacks merit.  They fail to meet

their burden of showing that they enjoy immunity pursuant to the International

Organizations Immunities Act ("IOIA").  Certainly no such immunity flows from the

June 8, 2010 amendment to the IOIA.  It is not a mandatory statute, much less a self-

_____

[1] Defendants style themselves as "Specially Appearing Defendants", even though special
appearance was abolished long ago in federal court.  *See Whittier v. Emmet et al.*, 281 F.2d 24 n.
169 (D.C. Cir. 1959).

executing one.  The *permissive* amendment merely provides that immunity "may" be extended to OHR and its "officers" and "employees".  It does not in any way exempt Defendants from the IOIA's requirement that a candidate entity must first satisfy the statutory definition of an "international organization".  Defendants concede this.  Where they fall short, however, is in failing to prove that they fall within this definition.

For instance, Defendants' contention that the amendment provides the requisite congressional "authoriz[ation]" for US[2] "participation" in OHR[3] is belied by judicial admissions made by OHR and a former HR Miroslav Lajcak ("Mr. Lajcak") in a US appellate proceeding.  There, these two appellees argued that the amendment only represented Congress' "intent to shield OHR [from US lawsuits]."  They *did not* at that time claim that the amendment constituted an "authoriz[ation]" for US "participation" in OHR.  OHR's *volte-face* on this issue is not supported by the plain language of the amendment, which makes pellucid that the statute is an immunity-related statute, not one "authorizing" US "participation" in OHR.  The plain language of President Barack Obama's March 8, 2011 executive order confirms this.

Not only is there no Congressional "authoriz[ation]"; there is no US "participation" either.  A 2013 US government publication confirms that OHR is not an "international organization[ ] in which the United States participates."  OHR and Mr. Lajcak themselves judicially admitted that the US does not "pariticpat[e]" in OHR.  They did so in a 2008 federal diversity action, where these defendants claimed OHR was a

---

[2] Plaintiff employs herein the shorthand references adopted in the Complaint.

[3] Of the five IOIA rubrics, Defendants claim only this and one other as applicable to them.

foreign sovereign, not an international organization (with state-members).  Accordingly,

OHR and Mr. Lajcak sought immunity under the Foreign Sovereign Immunities Act

("FSIA"), not the IOIA.

To shore up this deliquescent FSIA claim, OHR and Mr. Lajcak eloquently argued

that the selfsame IOIA which Defendants now embrace did not apply to them.[4]

Specifically, OHR and Mr. Lajcak admitted that OHR does not fit the profile of an IOIA-

defined "international organization" because:  (1) the US does not participate in it; and

(2) OHR has no presence or operations in the US.

Six years on, the Motion fails to show that these circumstances have changed since

OHR's self-lacerating judicial admissions in 2008.[5]  And yet, the Janus-faced Defendants

ask the Court to cloak them with the immunity which OHR and Mr. Lajcak bolted from

in federal court in 2008.

With judicial estoppel barring Defendants' shape-shifting in the instant action[6],

they may not look to President Obama's intervening 2011 executive order for salvation –

for, as they concede, an executive order is only one of two *conjunctive* IOIA

---

[4] The district court gave short shrift to OHR/Mr. Lajcak's 2008 FSIA claim; its 2009 decision elided said claim – but not before branding it as "novel and thorny".  So, now, Defendants are trying their luck with the IOIA.  OHR's chameleonic mutability in judicial proceedings is breathtaking.  Its IOIA claim *du jour*, retrieved from the dustbin to which OHR and Mr. Lajcak consigned it in 2008, should be seen for what it is:  a cynical attempt to twist a US statutory scheme and subvert its purpose in a desperate effort to keep Defendants' persecutory conduct from coming to light in a forum which even they do not dispute is the only one available to a *pro se* plaintiff who has suffered grievously at Defendants' hands.

[5] Indeed, the Motion gives pride of place (p. 2) to Defendants' material admission that OHR has "no presence in the United States."

[6] OHR's 2008 judicial admissions are binding on Dr. Inzko and Lord Ashdown, as shown below.

prerequisites, *both* of which must be satisfied before immunity is accorded.  The other is the above-referenced definitional criteria.[7]

That Defendants do not satisfy these criteria is confirmed by the fact that, in the above-referenced appeal, the Ninth Circuit elided an identical claim, following a one-and-a-half-year proceeding.  The Court decided the case on the basis of personal jurisdiction instead.[8]  Such judicial circumvention of a subject matter jurisdiction argument is deemed a reflection of its "difficult[y] and novel[ty]".  Immunity claims are required to be "clear".  Therefore, the Ninth Circuit's parrying of appellees' IOIA argument counsels against this Court blazing a new trail by recognizing it now, particularly as Defendants have repeatedly exposed their grave misgivings about their IOIA claim.

In 2011, for instance, OHR and Mr. Lajcak withheld the executive order from the Ninth Circuit for some time after its issuance, which came in the three critical weeks leading up to the Court's signaled disposition.  Surreally, it was the appellant who finally broke the appellees' week-long silence by unveiling the executive order, along with its deficiencies, which OHR and Mr. Lajcak declined to address in a reply submission.  Then, six months *after* the executive order's issuance and dismissal of the Ninth Circuit

---

[7] In any event, the executive order itself is erroneous and an abuse of discretion.  This is confirmed in part by its lack of specific findings disclosing any facts showing that Defendants satisfy the IOIA's definitional criteria.  If executive discretion in this context is found to be unconstrained by the IOIA's definitional criteria and, therefore, unfettered, the President could theoretically accord IOIA immunity to anyone, including his administration, political party, friends, family or, indeed, himself.  Such a finding would not only render the IOIA nugatory and otiose; it would also potentially undermine the constitutionally-embedded principle of judicial review of executive action.

[8] Defendants make only a "passing reference" to personal jurisdiction in the Motion.

4

appeal, OHR, Mr. Lajcak and Dr. Inzko enquired into the unsuccessful US appellant's

"key legal theories he ha[d] developed to protect [OHR and the HRs] from [US] lawsuits

like his."  As recently as April 2013, OHR and Dr. Inzko's tremulousness about their

IOIA claim surfaced yet again.  On that occasion, they sought United Nations ('UN")

immunity *immediately following* a media exposé on their lack of US immunity.  If, as

these facts suggest, Defendants have no confidence in their now-vaunted IOIA immunity

claim, neither should the Court.

Defendants have run the gamut:  first they sought FSIA immunity, then IOIA

immunity, next UN immunity and now IOIA immunity again.[9]  Even if OHR's

"immunity-shopping" does somehow succeed this time around, Dr. Inzko and Lord

Ashdown would not benefit.  The undisputed record shows that neither is *currently* an

OHR "officer[ ]" or "employee[ ]".  Defendants do not dispute the Complaint's allegation

that OHR is the HRs' "agent", not *vice versa*.  Defendants do not even deny the

Complaint's other allegation that OHR lacks the juridical personality necessary to enter

into employment contracts – or, indeed, to enjoy and exercise other legal rights such as

the one it now claims under the IOIA.

Lastly, Defendants identify no alternative forum where Plaintiff may seek judicial

redress.

---

[9] Defendants' serial *volte-faces* invite a paraphrase from Robert Bolt's *A Man for All Seasons*: "We must just pray that when [their] head[s are] finished turning, [Defendants'] face[s are] to the front again."

Viewed from any angle, the IOIA offers no safe harbor to Defendants.  Subject matter jurisdiction, therefore, lies.

## II.  STATEMENT OF FACTS ("SoF")

Preliminarily, Plaintiff notes that Defendants adduce no evidence disputing any of the Complaint's allegations.[10]  These are, therefore, deemed true.  *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011).  The reams of material Defendants submit instead advance a reverse *ad hominem* argument, one designed to hallow Defendants as irreproachable saints on a messianic crusade in Bosnia.  Defendants' irrelevant exhibits and hagiographies are intended for atmospherics only and to deflect the Court's attention from the question of subject matter jurisdiction, which is, after all, the only legal issue at bar.[11]  As to this, the conceded, undisputed and/or other material facts below show that nothing has changed since OHR and Mr. Lajcak judicially admitted in 2008 that the IOIA is inapplicable to them.

---

[10] In their reply brief, Defendants may not spring on the Plaintiff "for the first time" any hitherto-undisclosed "evidence" in this regard.  *See Herbert v. National Academy of Sciences*, 974 F.2d 192, 196 (D.C. Cir. 1992); *Flynn v. Veazey Constr. Corp.*, 310 F.Supp.2d 186, 190 (D.D.C. 2004).

[11] If international celebrity were in any way a relevant issue, Plaintiff could not possibly hope to outshine Defendants.  He has no peerages or paeans to parade before the Court.  This humble former civil servant's only claim to fame is that he was plucked from obscurity and publicly condemned to a decade of living torment by the extrajudicial decree of Defendants for no reason other than the fact that he was a member of Bosnia's Orthodox Serb minority.  Defendants seek to conceal their persecutory campaign behind their *curricula vitae* because they have no other means of defending the indefensible.  Their assumption that brandishing international accolades will earn them a "free pass" in these proceedings does them and the Court dishonor.

A.    **Conceded Facts**

**Conceded Fact 1:**  Defendants have the burden to prove that they meet the

statutory definition in the IOIA, 22 U.S.C. § 288 *et seq*., of an "international

organization" ("IOIA's Definitional Criteria"), as codified in 22 U.S.C. § 288 ("Parent

Statute").  Motion, pp. 9-10.  **Related Facts:**  OHR and Mr. Lajcak have stated on record

that OHR does not satisfy the IOIA's Definitional Criteria.  *See* Declaration of Zoran

Zuza ("Zuza Decl."), **Ex. 2**[12], 27:12-22 (OHR counsel [Defendants' counsel herein]

arguing that, just because OHR does not satisfy the IOIA's Definitional Criteria, that

does not imply that OHR does not enjoy FSIA immunity); 28:4-14 (OHR counsel urging

court not to apply the IOIA's Definitional Criteria to his client, but to focus on the

FSIA's immunity test instead).  As shown in Conceded Facts 3-6, *infra*, no material fact

has changed since 2008.

**Conceded Fact 2:**  The IOIA's Definitional Criteria has several components.

Motion, pp. 9-10.

**Conceded Fact 3:**  Defendants claim IOIA immunity only on the basis of two of

said components:  (a) Congressionally "authoriz[ed]" US "participation" in OHR, as

allegedly evidenced by 22 U.S.C. § 288f-7 ("Amendment"); and (b) Executive Order

13568, signed by President Barack Obama on March 8, 2011 ("EO").  Motion, p. 10.

**Related Facts:**  As will be shown in the "Argument" below, the Amendment does not

---

[12] Relevant portions of the December 19, 2009 hearing on the motion to dismiss of defendants
OHR and Mr. Lajcak ("12/19/08 Hearing Transcript") in the diversity action entitled *Anthony
Sarkis v. Miroslav Lajcak, Office of the High Representative*, No. C-08-01911, 2009 WL
3367069 (N.D. Cal. Oct. 15, 2009) ("Sarkis District Court Action").

constitute Congressional "authoriz[ation]" for US "participation" in OHR.  As regards

this alleged "participation", Defendants submit no evidence showing that the US

"particpat[es]" in OHR any more now than it did in 2008, when OHR judicially admitted

that it did not qualify for IOIA immunity precisely because the US does not

"participat[e]" in it.[13]  *See*  Zuza Decl., **Ex. 1**[14], 11:16 ("…IOIA does not apply to

OHR"), 12:5-10 (OHR arguing that the IOIA did not apply to it because the US did not

"participate" in it); **Ex. 2**, 28:16-17, 9:2-4 (OHR counsel [and Defendants' counsel

herein] addressing Court):

> [OHR] is not – the High Representative is not a membership organization.  It's not like the UN, the IMF, the World Bank; it doesn't have members.[15]

11:7-13 (OHR counsel arguing that "[IOIA immunity] would have been granted [to

OHR], [because of] the US' great support for the Dayton Peace Accord", *not because the*

---

[13] OHR's 2008 judicial admissions of this and other points (discussed below) are binding on Dr. Inzko and Lord Ashdown because Defendants have not disputed the Complaint's allegation (¶ 9) that OHR serves as the "agent" and "instrumentality" of the HRs.  *See United States v. Morgan*, 581 F.2d 933, 938 (D.C. Cir. 1978) (recognizing this "general rule", as articulated in *United States v. Pandilidis*, 524 F.2d 644, 650 (6th Cir. 1975) and *United States v. Powers*, 467 F.2d 1089, 1095 (7th Cir. 1972)); *see also Konstant Products, Inc. v. Liberty Mutual Fire Insurance Co.*, 929 N.E.2d 1200, 1203-1204 (2010).  In this connection, Plaintiff notes also that the counsel who made these damaging judicial admissions on behalf of OHR represents all three Defendants herein.  Defendants' judicial admissions on this (and other points discussed below) judicially estop them to argue otherwise in the Motion.  *Moses v. Howard University Hospital*, 606 F.3d 789, 798-799 (D.C. Cir. 2010).

[14] Relevant portions of OHR and Mr. Lajcak's 2008 reply in support of their motion to dismiss in the Sarkis District Court Action ("OHR/Lajcak's 2008 Reply").

[15] If these facts have changed since 2008, Defendants should have adduced the relevant evidence in the Motion so that Plaintiff could respond to it.  If such evidence does indeed exist – which is highly doubtful – Defendants may not attempt to outflank Plaintiff with it "for the first time" in their reply brief.  *Herbert v. National Academy of Sciences*, 974 F.2d 192, 196 (D.C. Cir. 1992); *Flynn v. Veazey Constr. Corp.*, 310 F.Supp.2d 186, 190 (D.D.C. 2004).

*US allegedly "participat[ed]" in OHR*).  So anxious were OHR and Mr. Lajcak in 2008 to prevent the court from applying the IOIA's Definitional Criteria to them that, on OHR's website, they changed the reference to OHR from "international organization" to "international *institution*".  (Emphasis added.)  *See* Zuza Decl., **Ex.** 3[16], ¶ 5 (and its referenced and attached exhibit B).

**Conceded Fact 4:**  The Amendment, standing alone, does not confer immunity on Defendants.  Motion, pp. 9-10.

**Conceded Fact 5:**  The EO, standing alone, is a necessary *but insufficient* condition for IOIA immunity.  Motion, pp. 9-10.

**Conceded Fact 6:**  OHR has "no presence in the United States" (in the form of office[s] and stationed staff).  Motion, p. 2.  **Related Facts:**  OHR has on multiple occasions judicially admitted that, because it has no presence in the US, it does not satisfy the IOIA's Definitional Criteria (an accurate statement of the law).  *See* Zuza Decl., **Ex. 1** (OHR/Lajcak's 2008 Reply), 1:24 through 2:1-5 (OHR arguing that the FSIA, *not the IOIA*, applied to it because the "[the IOIA] was enacted to encourage the United Nations and other international organizations to put their headquarters in the United States and not as a comprehensive source of immunity"); 11:16 ("While IOIA does not apply to OHR,… ."), 12:11-16 (OHR's argument that, because OHR is not headquartered in the US, the FSIA, *not the IOIA*, applies to it), fn. 37 (OHR citing IOIA legislative history showing that IOIA intended exclusively for organizations with

---

[16] Declaration of former OHR general counsel Anthony Sarkis ("Mr. Sarkis") in opposition to OHR/Mr. Lajcak's 2008 motion to dismiss in the Sarkis District Court Action ("Sarkis Decl.").

"headquarters" in the US and for "foreign employees com[ing to the US expecting] southern hospitality"); **Ex. 2** (12/19/08 Hearing Transcript), 6:7-12 (OHR counsel [representing Defendants herein] arguing that IOIA was designed only for those "international organizations that wish to center their operations [in the US]"); 6:13-24 through 7:1-3 (OHR counsel  arguing that his client had immunity, even though it did not fall within the IOIA because it was not based in the US); 9:21-25 through 10:1-5; 10:10-14; 11:7-13 ('There was never any reason to go to Congress and say, '[OHR is] going to be operating in the United States and, therefore, we ought to have immunity.").  OHR's 2008 judicial admissions are binding on Dr. Inzko and Lord Ashdown, and trigger judicial estoppel herein.  *See* footnote 13, *supra*.  Nothing has changed since 2008.  Defendants admit they still have "no presence in the United States."  Motion, p. 2.

## B.    <u>Undisputed Facts</u>

**Undisptued Fact 1:**  The GFAP, which Defendants claim is their constitutive instrument, has never been ratified by the Bosnian parliament.  Complaint, ¶ 15.  **Related Facts:**  Defendants implicitly concede this fact, as they do not claim IOIA immunity on the basis of a "treaty".  Motion, pp. 9-10.  The GFAP is an executive agreement signed in 1995 on behalf of a Bosnian administration no longer in office.  The record does not reflect that the superannuated GFAP has been ratified since the conclusion of Sarkis District Court Action, where OHR and Mr. Lajcak likewise did not dispute evidence that the GFAP was unratified.  *See* Zuza Decl., **Ex. 3** (Sarkis Decl.), ¶ 23.  Defendants have also fail to show that an unratified Bosnian executive agreement, such as the GFAP, has the force of law in that country.  In this connection, OHR and Mr. Lajcak did not

controvert Mr. Sarkis's 2008 testimony that OHR derives no special rights or benefits from Bosnian law.[17]  *See* Zuza Decl., Ex.C, ¶ 23.

**Undisputed Fact 2:**  The US is not a party to the GFAP.  Complaint, ¶ 15.

**Undisputed Fact 3:**  OHR does not possess a juridical personality.  Complaint, ¶ ¶ 15 & 109.  **Related Facts:**  OHR implicitly conceded this fact in the Sarkis District Court Action when its counsel judicially admitted that OHR has no "bylaws".[18]  Zuza Decl., **Ex. 2** (12/19/08 Hearing Transcript), 9:7-8.  Moreover, Defendants have failed to prove that the unratified GFAP, which they claim established OHR, has the force of law in Bosnia, enabling it to create corporate bodies.  *See* Undisputed Fact 1 *supra*.

**Undisputed Fact 4:**  OHR, as an organization or a cognizable legal person, is not referenced in the GFAP.  Complaint, ¶15.

**Undisputed Fact 5:**  OHR constitutes the "staff" of the incumbent HR. Complaint, ¶ 9.  **Related Facts:**  In the Sarkis District Court Action, OHR and Mr.

---

[17] In light of the foregoing, Defendants' assertion that they are exempt from Bosnia's service of process laws fails.  Its lynchpin – the unratified GFAP, which allegedly confers on Defendants diplomatic immunity – does not trump Bosnia's service laws that have, by contrast, been enacted by the Bosnian parliament.  Defendants fail to meet their burden of showing the contrary.  That Defendants' *sotto voce* service argument is buried in footnote 21 of the Motion demonstrates that it merits no further comment or judicial attention.  *See Keaton v. Cobb County*, 2009 WL 212097 (11th Cir. 2009), *10; *Tallahassee Mem'l Reg'l Med. Ctr. v. Bowen,* 815 F.2d 1435, 1446 n. 16 (11th Cir. 1987); *United States v. Jernigan,* 341 F.3d 1273, 1284 n. 8 (11th Cir. 2003); *see also Bartholdi Cable Co., Inc. v. FCC, et al*., 114 F.3d 274, 279-280 (D.C. Cir. 1997); *WAIT Radio v. FCC*, 418 F.2d 1153, 1157 (D.C. Cir. 1969); *Alianza Federal de Mercedes v. FCC*, 539 F.2d 732, 739 (D.C. Cir.1976); *Washington Ass'n for Television and Children v. FCC*, 712 F.2d 677, 681 (D.C. Cir.1983).

[18] International organizations possessing a juridical personality typically have bylaws. *See* Zuza Decl., ¶ 17 (internet links to the bylaws of the International Monetary Fund ("IMF"), the World Bank and the International Committee of the Red Cross ("ICRC")).

Lajcak did not dispute evidence that HRs are superordinate to OHR.  *See* Zuza Decl., Ex. 3 (Sarkis Decl.), ¶¶ 8-11.

**Undisputed Fact 6:**  OHR acted/acts as agent/agency, instrumentality, alter ego for the incumbent HR Dr. inzko, and/or is otherwise under his direction and control, and/or is the beneficiary of his delegation of authority.  Complaint, ¶ 9.

**Undisputed Fact 7:**  During Lord Ashdown's mandate as HR, OHR acted as agent/agency, instrumentality, alter ego for the Lord Ashdown, and/or was otherwise under his direction and control, and/or was the beneficiary of his delegation of authority. Complaint, ¶ 9.

**Undisputed Fact 8:**  Throughout their respective mandates, Lord Ashdown and Dr. Inzko exert[ed] total administrative/operational control over OHR and exercise[ed] total dominion over its assets.  Complaint, ¶ 9.

**Undisputed Fact 9:**  During their respective mandates, neither Lord Ashdown nor Dr. Inzko was/is legally accountable to any entity with a juridical personality. Complaint, ¶ 9.

**Undisputed Fact 10:**  PIC is a political construct, lacks a juridical personality and is not referenced in the GFAP.  Complaint, ¶ 16.

**Undisputed Fact 11:**  No alternative forum exists for the adjudication of Plaintiff's claims.  Complaint, ¶ 51.

**Undisputed Fact 12:**  Lord Ashdown was the HR who removed Plaintiff from his civil service post and banned him from political life and public sector employment. Complaint, ¶ 7.

**Undisputed Fact 13:**  Dr. Inzko, the current HR, is the legal successor-in-interest to Lord Ashdown.  Complaint, ¶¶ 8, 113-114, 116.

**Undisputed Fact 14:**  Upon accession to the office of HR, Dr. Inzko ratified, affirmed and adopted as his own the act referenced in Undisputed Fact 12, *supra*. Complaint, ¶¶ 8, 115.

## C.   Other Material Facts

**Material Fact(s) 1:**  Between 2009 and 2011, there was pending before the United States Court of Appeals for the Ninth Circuit ("Ninth Circuit") an appeal captioned *Anthony Sarkis v. Miroslav Lajcak; Office of the High Representative*, App. No. 09-17506 ("Sarkis Appeal").  Questions on appeal (*de novo*) were personal jurisdiction and subject matter jurisdiction (FSIA and IOIA).  Zuza Decl., Ex. 4[19] ("Table of Contents"). On March 28, 2011, the Ninth Circuit affirmed the lower court's ruling that personal jurisdiction did not lie.[20]  The Ninth Circuit disregarded, in their entirety, Appellees'

---

[19] Relevant portions of the responsive brief of appellees OHR and Mr. Lajcak ("Appellees") in the Sarkis Appeal.

[20] In their thirteen-page moving memorandum, Defendants allude only once to "personal jurisdiction".  Buried in a single footnote deep in the Motion, this "passing reference" does not rise to the level of a cognizable jurisdictional defense.  *See Keaton, supra*, 2009 WL 212097 at *10 ("…Keaton's single, passing reference to a 'mixed motive' theory *in a footnote* contained in her response…was not sufficient to preserve the issue for appeal" [emphasis added]); *Tallahassee, supra*, 815 F.2d at 1446 n. 16; *United States v. Jernigan, supra*, 341 F.3d at 1284 n. 8; *see also Bartholdi, supra*, 114 F.3d at 279-280 ("The Commission 'need not sift pleadings and documents to identify' arguments that are not 'stated with clarity'… ."); *WAIT Radio, supra*, 418 F.2d at 1157; *Alianza, supra*, 539 F.2d at 739 (argument not considered because, although "…the grist was there, [ ] nothing was made of it"); *Washington Ass'n, supra*, 712 F.2d at 681.  Failing to raise a Rule 12(b)(2) argument in their moving memorandum, Defendants may not sandbag Plaintiff by doing so "for the first time" in their "reply brief" submitted when Plaintiff would have no "opportunity for a written response."  *Herbert, supra*, 974 F.2d at 196; *Flynn, supra*, 310 F.Supp.2d at 190.  Should, at some later juncture, the Court elect to entertain briefing on

13

subject matter jurisdiction arguments based on the FSIA and IOIA.[21]   Neither was

referenced in the Court's opinion.[22]   *Sarkis v. Lajcak et al.*, 425 Fed.Appx. 557 (9th Cir.

2011).   (Though unpublished, this 2011 decision may be cited.   Fed. R. App. P. 32.1.)   At

no time during the Sarkis Appeal did Appellees contend that the Amendment represented

a Congressional "authorization" of US "participation" in OHR.   Rather, they argued

*exclusively* that the Amendment "indicates Congress' intent to shield OHR from lawsuits

such as the one Mr. Sarkis has brought."   Zuza Decl., Ex. 4, p. 35 (last sentence) & Ex. 6.

**Material Fact(s) 2:**   Though issued on March 8, 2011, the EO was not brought to

the attention of the Ninth Circuit until March 14, 2011 – and then not by Appellees but by

appellant Mr. Sarkis.   *See* Zuza Decl., Ex. 5.   In this March 14, 2011 submission

introducing the EO (and filed pursuant to Fed. R. App. P. 28(j)), Mr. Sarkis argued in

Defendants' "passing reference" to personal jurisdiction, Plaintiff will, at that time:  **(a)** underscore the fact that Defendants do not dispute his allegations that:  (i) Plaintiff's claims arise from actions taken in the District of Columbia; (ii) he was injured in the District of Columbia in consequence of Defendants' actions; and (iii) Defendants have engaged in multiple, continuous, systematic, substantial, self-beneficial/promotive and pecuniary contacts with the District of Columbia (Complaint, ¶¶ 1 [final nine lines], 21, 39-50, 52-55, 60); and **(b)** cite relevant authority, *e.g.*, *Blumenthal v. Drudge*, 992 F.Supp. 44, 56-58 (D.D.C. 1998), showing that these undisputed forum contacts are jurisdictionally sufficient.  Additionally, should the Court order briefing on Defendants' "passing reference" to personal jurisdiction, Plaintiff will, at that time, seek leave to conduct jurisdictional discovery with respect to the collaboration and communication between Defendants and Washington, D.C.-based organs of the US government in the acts complained of in the Complaint.  ¶¶ 1, 39-40 and 60.

[21] The court in the Sarkis District Court Action likewise disregarded the defendants' then-exclusively FSIA immunity claim – but not before labeling it as "novel and thorny".  2009 WL 3367069 (N.D. Cal. Oct. 15, 2009).

[22] Even though President Obama had three weeks earlier issued the EO, which was placed on the appellate record on March 14, 2011.  *See* Material Fact(s) 2, *infra*.  The EO was intended to influence the outcome of the Sarkis Appeal.  This is evidenced by the fact that it was issued within days of the Ninth Circuit panel signaling an imminent decision in the Sarkis Appeal.  *See* Zuza Decl., Ex. 15 (March 3, 2011 Ninth Circuit Order).

14

detail:  (1) that the  EO's issuance in no way alters the dispositive fact that Appellees

(and, by extension, Defendants herein) do not satisfy the IOIA's Definitional Criteria;

and (2) that the EO should be disregarded as an abuse of executive discretion.  Appellees

did not oppose these arguments in their own March 14, 2011 letter-submission, which

they filed several hours after MR. Sarkis's (as evidenced by the respective "DktEntry"

numbers appearing on each submission).  Zuza Decl., Ex. 6.  On March 15, 2011, Mr.

Sarkis filed another submission spotlighting this lacuna.  Zuza Decl., Ex. 7 (specifically,

fn. 2).  Appellees elected not to file an opposition to Mr. Sarkis's March 15, 2011

submission.[23]

**Material Fact(s) 3:**  On September 21, 2011, six months *after* the EO's issuance

and dismissal of the Sarkis Appeal (on March 28, 2011), Appellees[24] enquired into Mr.

Sarkis's "key legal theories he ha[d] developed to protect [OHR and Mr. Lajcak] from

[U.S.] lawsuits like his."  Zuza Decl., Ex. 8.

---

[23] Appellees' failure to oppose Mr. Sarkis's two submissions in March 2011 is judicially construed as a "conce[ssion]" of Mr. Sarkis's arguments (deemed "meritorious" because they were unopposed) and as "consent" to the granting of the request in his submissions, *i.e.*, rejection of the EO because Appellees did not satisfy the IOIA's Definitional Criteria.  *See Ali v. D.C. Court Servs.*, 538 F.Supp.2d 157, 161 (D.D.C. 2008); *Cossey v. David*, U.S.N.D.N.Y. Case No. 9:04-CV-1501 (FJS/GHL), August 27, 2007, pp. 9-10; *Sexton v. Superior Court*, 58 Cal.App.4[th] 1403, 1410; *see also* D.D.C. LCvR 7(b).  OHR's 2011 judicial "conce[ssion]" and "consent" are binding on Dr. Inzko and Lord Ashdown.  *See* fn. 13, *supra*.  Accordingly, judicial estoppel precludes all three Defendants from contradicting themselves in the case at bar.  *Ibid*.  The Motion, however, does precisely that by arguing that Defendants satisfy the IOIA's Definitional Criteria and that the EO grants them immunity.  The Motion should, therefore, be denied.

[24] At the time, Mr. Lajcak was no longer HR.  Dr. Inzko had succeeded him as HR in 2009, as confirmed by **Defendants'** Exhibit 14.  Therefore, the reasonable inference is that this enquiry was at the direction of and/or for the benefit of Defendant herein Dr Inzko.

**Material Fact(s) 4:**  After the EO's issuance on March 8, 2011, members of the United Nations Security Council ("UNSC") closely affiliated with OHR and Dr. Inzko applied, on behalf of Defendants herein, for UNSC immunity.  *See*, *e.g.*, Zuza Decl., Ex. 9[25], p. 11.  On April 4, 2013, the Bosnian weekly television newsmagazine program *Pecat* (on the RTRS network) reported that, immediately following its exposé of OHR's lack of immunity in the US a week earlier (on March 27, 2013), OHR had redoubled its effort (through sympathetic UNSC members) to secure UNSC immunity.  *Pecat* further reported:  (1) that it had invited OHR to comment in advance on the newsmagazine's planned report that OHR had sought UNSC immunity: and (2) that OHR had declined to provide comment.[26]  Zuza Decl., Ex. 10.[27]

**Material Fact(s) 5:**  Defendants adduce no evidence showing that Dr. Inzko and Lord Ashdown are/were "officers" or "employees" of OHR, the two categories of natural persons referenced in the Amendment and the EO.  Neither Dr. Inzko nor Lord Ashdown nor anyone else from OHR has submitted a declaration on this or on any other relevant

---

[25] Official minutes of the UNSC's May 15, 2012 meeting, p. 11 (request from German permanent representative to the UNSC):

> With regard to the question of immunity from legal proceedings of present and former staff of the Office of the High Representative, we continue to favour a sustainable and comprehensive solution at some stage.

Germany is a member of the PIC Steering Board, which, according to Defendants, "nominates the High Representative."  *See* Motion, fn. 3.

[26] OHR's failure to deny *Pecat*'s "statement" or "assertion" constitutes an admission thereof, inasmuch as "it would have been natural" for OHR to deny it if, indeed, OHR had not applied to the UNSC for immunity immediately after *Pecat*'s disclosure that it lacked US immunity.  *See US v. Hale*, 422 U.S. 171, 176 (1975); *Kelly v. US*, 236 F.2d 746, 749 (D.C. Cir. 1956); *US v. Hove* 52 F.3d 233, 236-237 (9th Cir. 1995).

[27] Transcript of *Pecat*'s April 4, 2013 telecast.

subject, for that matter.[28]  HRs are superordinate to OHR, not *vice versa*.  Zuza Decl., Ex.

3 (Sarkis Decl.), ¶¶ 8-11.  HRs do not regard or represent themselves as an "officer" or

"employee" of OHR.  HRs' public comments and stationery confirm this.  Zuza Decl.,

Ex.11[29] & Complaint, Ex. B[30] (*cf.* Zuza Decl., Ex. 12[31]).  OHR does not appoint HRs.

According to the OHR webpage cited by Defendants (Motion, fn. 3), HRs are

"nominated" by the PIC Steering Board and "endorsed" by the UNSC.  (Defendants fail

to show that PIC or its Steering Board is a constituent part of OHR.)  Nowhere in

Defendants' voluminous exhibits does a document appear showing that OHR "hires" the

HRs.  According to an OHR online press release, HRs and the PIC claim the exclusive

authority to "clos[e]" OHR.  Zuza Decl., Ex. 13.  OHR plays no role in its own "closure".

## III.  LEGAL STANDARD

When considering a motion under Rule 12(b)(1), the court must accept as true all

uncontroverted material factual allegations contained in the complaint and "construe the

complaint liberally, granting plaintiff the benefit of all inferences that can be derived

from the facts alleged and upon such facts determine jurisdictional questions."

---

[28] Defendants may not produce any such "new" evidence "for the first time" in their "reply brief" when Plaintiff would have "no opportunity for a written response."  *See Herbert*, *supra*, 974 F.2d at 196; *Flynn*, *supra*, 310 F.Supp.2d at 190.

[29] Dr. Inzko's May 15, 2012 address to the UNSC, in which he refers to OHR as "my Office" (p. 3).

[30] HR Ashdown's July 1, 2004 letter to Plaintiff, which bears only the title "High Representative of Bosnia and Herzegovina" with no prepositional phrase (beginning with the critical "of") connecting it to OHR.

[31] Letters from heads of international organizations identifying the sender as "President [of the organization]" or as "Under-Secretary-General *of* the United Nations".  (Emphasis added.)

17

*Am. Nat'l Ins. Co.*, *supra*, 642 F.3d at 1139.  A district court may consider materials outside the pleadings in deciding to grant a motion for lack of jurisdiction.  *Jerome Stevens Pharm., Inc. v. FDC*, 409 F.3d 1249, 1253 (D.C. Cir. 2005).

A claim for IOIA immunity must be "justly invoked".  *See Tuck v. Pan American Health Organization*, 668 F.2d 547, 549-550 (D.C. Cir. 1981).  As the IOIA is deemed analogous to the FSIA, 28 U.S.C. § 1605 *et seq.*,[32] the burden of proof under the latter statute applies to the former.[33]  *See Puerto Rico Ports Authority v. Umpierre Solares*, 456 F.3d 220, 227 (1st Cir. 2006) ("…we look to the limitations period contained in the most analogous federal or state statute in order 'to establish burdens of proof'… .").

Under the FSIA – and, therefore, IOIA – it is the defendant's burden to prove that plaintiff's complaint is not receivable due to immunity.  *Mwani v. bin Laden*, 417 F.3d 1, 15 (D.C. Cir. 2005), citing *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1131 (D.C. Cir. 2004).  Immunity should be accorded only in "clear cases", as it is "a derogation from the normal exercise of jurisdiction by the courts."  *Victory Transport Inc. v. Comisaria General de Abastecimientos y Transportes,* 336 F.2d 354, 360 (2d Cir. 1964), cert. denied, 381 U.S. 934 (1965).

---

[32] *See Nokalva v. European Space Agency*, 617 F.3d 756, 762-765 (3rd Cir. 2010).

[33] Defendants agree that certain of FSIA standards apply herein.  *See* Motion, pp. 11-12 (Defendants relying on multiple FSIA precedents to argue that proscribed retroactivity is not an issue).

## IV.  ARGUMENT

A.    **Defendants Fail To Meet Their Burden Of Showing That Their Claim To IOIA Immunity Is "Justly Invoked" And "Clear"**

1.   *Defendants Do Not Claim That Congress <u>Directly</u> Conferred IOIA Immunity On Them*

*See* Motion, pp. 9-10.  Any other stance would have been unsustainable, as the following discussion shows.

In pertinent part, the Amendment provides:

> The provisions of this subchapter *may* be extended to the Office of the High Representative in Bosnia and Herzegovina (and to its offices and employees) or . . . in the same manner, to the same extent, and subject to the same conditions, as such provisions may be extended to a public international organization in which the United States participates pursuant to any treaty or under the authority of any Act of Congress authorizing such participation or making an appropriation for such participation.

(Emphasis added.)  Congress' use of the verb "may" in the Amendment renders the statute permissive, not mandatory.  *Bennett v. The Panama Canal Company*, 475 F.2d 1280, 1282 (D.C. Cir. 1973); *see also United States ex rel. Siegel v. Thoman*, 156 U.S. 353, 359-60 (1895) ("in the law to be construed here it is evident that the word 'may' is used in special contradistinction to the word 'shall'").  Accordingly, the Amendment did not create an "obligation impervious to judicial discretion."  *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998).

It is clear, therefore, the Amendment does not directly confer immunity on Defendants.  The burden to prove entitlement to immunity under the Parent Statute, therefore, remains squarely on Defendants' shoulders.  Defendants do not dispute these

19

two facts.  Motion, pp. 9-10.[34]  In fact, they confirm them when they:  (1) concede the

applicability herein of the Parent Statute's conditions precedent to granting immunity;

and (2) argue that the Amendment, coupled with the EO, satisfies these conditions

precedent.  Motion, pp. 9-10.  Whilst they are correct on point (1), Defendants fail to

prove their claim in point (2).

### 2.     *Defendants Do Not Satisfy The IOIA's Definitional Criteria*

They have judicially admitted this fact.  *See* Material Fact(s) 2 & fn. 23, *supra*.

The IOIA accords immunity only to those organizations which satisfy the

definition of "international organization", as codified in the Parent Statute:

> For the purposes of this subchapter, the term "international organization" means a
> public international organization in which the United States participates pursuant
> to any treaty or under the authority of any Act of Congress authorizing such
> participation or making an appropriation for such participation, and which shall
> have been designated by the President through appropriate Executive order as
> being entitled to enjoy the privileges, exemptions, and immunities provided in this
> subchapter.

As Defendants acknowledge (Motion, pp. 9-10), there are two prongs to this statutory

definition:  (1) organizational characteristics ("Characteristics Prong"); and (2) executive

order ("Executive Order Prong").  Due to the presence of the word "and" between these

two prongs in the Parent Statute, they are in the conjunctive.  Therefore, *both* "factors"

must be "present" before immunity may be extended.  *See Schneider v. Kissinger*, 412

F.3d 190, 193-194 (D.C. Cir. 2005); *see also Sanders v. Molla*, 985 A.2d 439, 442 (D.C.

---

[34] Indeed, OHR judicially admitted it in 2011.  In the Sarkis Appeal, the Appellees did not did
not oppose Mr. Sarkis's argument, made in two separate submissions, that the Amendment was
permissive, not mandatory.  *See* SoF, Material Fact(s) 2, *supra*.  Through their judicial silence,
OHR and Mr. Lajcak conceded this point.  *See* fn. 23, *supra*.  Their judicial concession is
binding on Dr. Inzko and Lord Ashdown.  *See* fn. 13, *supra*.

2009); *Lithium Corp. of Am., Inc. v. Town of Bessemer City*, 135 S.E.2d 574, 577 (N.C.1964).  Accordingly, once it is shown below that Defendants do not satisfy the Characteristics Prong, the EO alone will be insufficient to accord immunity to Defendants.  They concede as much.  Motion, pp. 9-10.

The Characteristics Prong consists of two conjunctive requirements:  (1) US participation in the organization:  (a) pursuant to treaty; or (b) authorized by statute or congressional appropriation ("Congressional Action Requirement"); **and** (2) the organization's physical presence and operations in the US ("US Presence/Operations Requirement").  The parties are in agreement on the Congressional Action Requirement and the fact that Defendants must satisfy one or more of its disjunctive elements.  *See* Motion, pp. 9-10.

As regards the US Presence/Operations Requirement, however, Defendants are silent, even though, in 2008, OHR and Mr. Lajcak invoked it when arguing that, precisely because they had no presence in the US in the form of offices or staff, the IOIA did not apply to them.  *See* SoF, Conceded Fact 6 (and its "Related Facts"), *supra*.  Defendants confirm that these circumstances have not changed in the intervening six years.  Motion, p. 2.

\\\\

\\\\

\\\\

### a. Defendants Do Not Satisfy The Congressional Action Requirement

Defendants do not claim that any alleged US participation in OHR is pursuant to a "treaty".[35]  Motion, pp. 9-10.  Nor do they assert that OHR is the beneficiary of Congressional "appropriation".  Their sole contention under the Characteristics Prong is that they satisfy the Congressional Action Requirement on account of the Amendment, which allegedly authorizes the alleged participation of the US in OHR.  This argument fails for the following reasons.

### i. In the Sarkis Appeal, Appellees Did Not Submit The Amendment As Evidence Of Congressional "Authorization" Of US "Participation" In OHR But Rather Of Alleged Congressional Intent To Extend IOIA Immunity To Them

*See* SoF, Material Fact(s) 1, *supra* (last two sentences).  Appellees' silence on the alleged "authorize[ed]" "participation" issue – when they were outspoken on the immunity issue – constitutes a judicial admission on the part of Appellees, including Co-defendant herein, OHR.  *See* fn. 13, *supra*.  OHR's judicial admission is binding on Dr. Inzko and Lord Ashdown.  *Ibid*.  All three Defendants are, therefore, judicially estopped to "change their tune" in the instant action by claiming that the Amendment represents Congressional "authorization" for US "participation" in OHR.  *Ibid*.

\\\\

\\\\

---

[35] Their silence on this score constitutes a tacit concession that the GFAP is not ratified.  *See also* SoF, Undisputed Fact No. 1, *supra*.

### ii.     The Language Of The Amendment Makes Clear That It Does Not Authorize US Participation In OHR

### (a) The Plain Language Of The Amendment Governs

"If the statute is clear and unambiguous 'that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *Bd. of Governors of the Federal Reserve v. Dimension Fin. Group*, 474 U.S. 361, 368 (1986). The Supreme Court reiterated this injunction three years later in *Ohio Pub. Employees Retirement System v. Betts*, 492 U.S. 158, 171 (1989) ("No deference is due to agency interpretations at odds with the plain language of the statute itself.").[36]

Contrary to Defendants' assertion (p. 10), the "plain language" of the Amendment does not authorize any alleged US participation in OHR. The words "authorize" and "participation" (or variants thereof) do not even appear in *direct* connection with OHR.

Instead, Congress expressly employed variants of these words in the Amendment in the generic sense only – when *distinguishing* the character of OHR from that of "*a public international organization* in which the United States *participates pursuant* to *any* treaty or under the authority of *any* Act of Congress *authorizing such participation* or making an appropriation for *such participation*." (Emphasis added.) This Congressional declaration that, *despite* the lack of "authoriz[ed]" US "participation" in OHR, said entity

---

[36] Other Circuits are in accord, particularly in the context of immunity. *See*, *e.g.*, *Af-Camp, Inc. v. Chevron Overseas (Congo), Ltd.*, 475 F.3d 1080, 1087-1088 (9th Cir. 2007) ("In interpreting the FSIA, we first look to the plain meaning of the language employed by Congress"); *Export Group v. Reef Indus.*, 54 F.3d 1436, 1473 (9th Cir. 1995) ("the ordinary meaning of [the statutory] language accurately expresses the legislative purpose"); *see also Bracamontes v. Holder*, 675 F.3d 380 ,386 (4th Cir. 2012); *Lanier v. U.S. Att'y. Gen*, 631 F.3d 1363, 1365 (11th Cir. 2011); *Martinez v. Mukasey*, 519 F.3d 532, 546 (5th Cir. 2008)  Courts "are not to imply exceptions". *Export Group*, *supra*, 54 F.3d at 1473.

"may" be accorded the *same* degree of immunity as the *generically*-referenced organization in which the US is *generically* "authorized" to "participate" confirms that the Amendment's "clear and unambiguous" language does not *directly* and *explicitly* "authoriz[e]" US "participation" in OHR.

The Amendment is an "immunity"-related statute, not an "authorizing participation" one.[37]  Defendants' alchemic attempt to transmute the former into the latter confirms that the Amendment provides neither "immunity" to OHR nor "authoriz[ation]" for US "participation" therein.

> **(b)** **As Congress Knows How To Use The Words "Authorize" And "Participation" In The Same Sentence Containing As Its Direct Object A Specific Organization, The Fact That The Amendment Does Not Do So In The Case Of OHR Confirms That The Congressional Omission Was Intentional**

In interpreting a statute, a court may draw a contrast between the statutory text at issue and other statutory language.  This statutory construction doctrine is typically encapsulated in the phrase "Congress knows how to say…" ("Congress-Knows-How-To-Say Construction Rule").  *See In re Hendrick*, 524 F.3d 1175, 1187  (11th Cir. 2008) ("Where Congress knows how to say something but chooses not to, its silence is controlling.").[38]

---

[37] This was also Defendants' position in the 2011 Sarkis Appeal, as shown in the section immediately above.

[38] *See also Dole Food Co. v. Patrickson*, 538 U.S. 468, 476 (2003) (Congress knows how to refer to an "owner" "in other than the formal sense," and did not do so in the Foreign Sovereign Immunities Act's definition of foreign state "instrumentality"); *Central Bank of Denver v. First Interstate Bank*, 511 U.S. 164, 176-77 (1994); *see also Franklin Nat'l Bank v. New York*, 347 U.S. 373, 378 (1954) (finding "no indication that Congress intended to make this phase of

24

Congress knows how to say "authorize" and "participation" when it intends to "authorize" US "participation" in an organization.  *See*, *e.g.*, **Public Law 689, July 11, 1956, 70 Stat. 562** ("JOINT RESOLUTION to *authorize participation* of the United States in parliamentary conferences of the North Atlantic Treaty Organization" [emphasis added]); **Public Law 87-490, June 19, 1962, 70 Stat. 105** ("AN ACT to amend the Bretton Woods Agreement Act to *authorize* the United States to *participate* in loans to the International Monetary Fund…." [emphasis added]); **Public Law 86-420, April 9, 1960, 74 Stat. 40** ("JOINT RESOLUTION to *authorize participation* by the United States in parliamentary conferences with Mexico" [emphasis added]); *see also* **22 U.S.C § 286** ("The President is hereby *authorized* to accept *membership* for the United States in the International Monetary Fund, … ." [emphasis added]); **Public Law 80-643, June 14, 1948, 62 Stat 441** ("The President is hereby *authorized* to accept *membership* for the United States in the World Health Organization, … ." [emphasis added]); **59 Stat. 619, December 20, 1945** ("United Nations *Participation* Act" [emphasis added] and "AN

---

national banking subject to local restrictions, as it has done by express language in several other instances"); *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 485 (1996) ("Congress . . . demonstrated in CERCLA that it knew how to provide for the recovery of cleanup costs, and . . . the language used to define the remedies under RCRA does not provide that remedy"); *FCC v. NextWave Personal Communications, Inc.*, 537 U.S. 293, 302 (2003) (when Congress has intended to create exceptions to bankruptcy law requirements, "it has done so clearly and expressly"); *Whitfield v. United States*, 543 U.S. 209, 216 (2005) (Congress has imposed an explicit overt act requirement in 22 conspiracy statutes, yet has not done so in the provision governing conspiracy to commit money laundering); *United States v. Fuller*, 531 F.3d 1020, 1027 (9th Cir. 2008) (applying rule of statutory construction that "where Congress includes particular language in one section of a statute but omits it in another section of the Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion").

ACT to … make other provisions with respect to the *participation* of the United States in [the United Nations]" [emphasis added]).

That Congress did not use similar ubiquitous language in the Amendment affirms that its omission and silence were intentional.[39]  *Dole Food*, *supra*, 538 U.S. at 476; *Central Bank of Denver*, *supra*, 511 U.S. at 176-77; *see also Franklin Nat'l Bank*, *supra*, 347 U.S. at 378; *Meghrig*, *supra*, 516 U.S. at 485; *FCC v. NextWave Personal Communications, Inc.*, *supra*, 537 U.S. at 302; *Whitfield*, *supra*, 543 U.S. at 216; *In re Hendrick*, *supra*, 524 F.3d at 1187; *United States v. Fuller*, *supra*, 531 F.3d at 1027.

Therefore, the Amendment was not intended to "authoriz[e]" US "participation" in OHR within the meaning of the Parent Statute.  Defendants' assertion to the contrary is groundless.

### iii.  The EO's Silence Likewise Makes Clear That The Amendment Does Not Satisfy The Congressional Action Requirement

The Congress-Knows-How-To-Say Construction Rule applies with equal force to the interpretation of presidential executive orders.  *Utely v. Varian Assoc., Inc.*, 811 F.2d 1279, 1285 (9th Cir. 1987); *Sutherland Statutory Construction*, § 31.06 (5th ed. Supp. 1998) ("*Sutherland*").

---

[39] The above-cited statutes are also instructive in that Congress therein follows its express "authoriz[ation]" of "participation"/"membership" in the relevant international organizations with provision for the appointment of "delegates", "representatives" or "envoys" to said organizations.  *Ibid*.  The Amendment takes no such concrete steps to appoint US delegates or representatives to OHR.  This omission further demonstrates that the Amendment was not a Congressional act "authorizing" US "participation" in OHR, which is a predicate for satisfying the Congressional Action Requirement.

When the Congressional Action Requirement is satisfied through legislation "authoriz[ing]" US "participation" (or "appropriation"[40]) in an international organization, US presidents "know how to" cite the authorizing statute in the body of the executive order according IOIA immunity to said organization.  *See*, *e.g.*, **Executive Order 12238, 45 Fed.Reg. 60877 (September 12, 1980)** ("…having found that the United States *participates* in the International Maritime Satellite Organization *pursuant* to Title V of the Communications Satellite Act of 1962…" [emphasis added]); **Executive Order 11977, 42 Fed.Reg. 14671 (March 14, 1977)** (designating as IOIA beneficiary:  "'[t]he African Development Fund, in which the United States *participates pursuant* to Section 202 of the Act of May 31, 1976…" [emphasis added] and "[t]he International Fertilizer Development Center, in which the United States *participates pursuant* to Section 301(f) of the Foreign Assistance Act of 1961,…" [emphasis added]); **Executive Order 11966, 42 Fed.Reg. 4331 (January 19, 1977)** ("[t]he International Development Association, in which the United States *participates pursuant* to the Act of Congress approved June 30, 1960 (74 Stat. 293, 22 U.S.C. 284) …, is hereby designated as a public international organization entitled to enjoy [IOIA immunity]" (emphasis added) … "[t]he International Centre for Settlement of In-vestment Disputes, in which the United States *participates pursuant* to the Act of Congress approved August 11, 1966 (80 Stat. 344, 22 U.S.C. 1650) and the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States (17 U.S.T. 1270, T.I.A.S. 6090), is hereby designated as a public international organization entitled to [IOIA immunity]" (emphasis added) … and

---

[40] Which Defendants do not claim as a basis for their IOIA claim.  Motion, pp. 9-10.

("[t]he International Telecommunications Satellite Organization (INTELSAT), in which the United States *participates pursuant* to the authority of the Communications Satellite Act of 1962 (76 Stat. 419, 47 U.S.C. 701-744) and in accord with the Agreement Relating to the International Telecommunications Satellite Organization (INTELSAT) and the Operating Agreement signed pursuant thereto (TIAS 7532), is hereby designated as a public international organization entitled to enjoy [IOIA immunity]" [emphasis added]); **Executive Order 11596, 36 Fed.Reg. 11079 (June 5, 1971)** ("…having found that the United States *participates* in the Customs Cooperation Council *pursuant* to the Convention Establishing a Customs Cooperation Council of December 15,1950, TIAS 7063,… ." [emphasis added]); **Executive Order 11484, 34 Fed.Reg. 15337 (September 29, 1969)** ("…having found that the United States *participates* in the United International Bureaux for the Protection of Intellectual Property (BIRPI) *pursuant* to the Convention of Paris for the Protection of Industrial Property of 20th March, 1883, as revised, 13 UST 1, and the joint resolution approved July 12, 1960, as amended, 22 U.S.C. 269f …" [emphasis added]); **Executive Order 10864, 25 Fed.Reg. 1507 (February 18, 1960)** ("…Having found that the United States *participates* in the Pan American Health Organization *pursuant* to the Pan American Sanitary Convention…" [emphasis added]); **Executive Order 10335, 17 Fed.Reg. 2741 (March 28, 1952)** ("…having found that the United States *participates* in the Provisional Intergovernmental Committee for the Movement of Migrants from Europe *under the authority* of the Mutual Security Appropriation Act, 1952, approved October 31, 1951 (65 Stat. 730)… ." [emphasis added]).

In the EO, President Obama did not employ these ubiquitous words, so liberally invoked by his predecessors.[41] His omission, therefore, is deemed "intentional" and expository of the executive branch's view that the Amendment does not constitutes a statute "authorizing" US "participation" in OHR.[42] *See Utely*, *supra*, 811 F.2d at 1285; *Sutherland*, *supra*, at § 31.06; *In re Hendrick*, *supra*, 524 F.3d at 1187; *see also Dole Food Co.*, *supra*, 538 U.S. at 476; *Central Bank of Denver*, *supra*, 511 U.S. at 176-77; *Franklin Nat'l Bank*, *supra*, 347 U.S. at 378; *Meghrig*, *supra*, 516 U.S. at 485; *FCC v. NextWave*, *supra*, 537 U.S. at 302; *Whitfield*, *supra*, 543 U.S. at 216; *United States v. Fuller*, *supra*, 531 F.3d at 1027.

\\\\

\\\\

\\\\

---

[41] The President only invokes the Amendment as the alleged basis for his purported extension of immunity to OHR. Immunity may not be conflated with "authorize[ed]" US "participation". Defendants submit nothing showing the contrary.

[42] Neither the Amendment nor the EO even states that the US allegedly "participat[es]" in OHR, much less that Congress "authoriz[ed]" the same. For instance, neither instrument uses the phrase "inasmuch as", to declare, *e.g.*, that "…inasmuch as [OHR] is an organization in which the US participates, [IOIA immunity may be extended to it]." Both Congress and the Chief Executive "know how to" establish a causal nexus by using the phrase "inasmuch as". *See*, *e.g.*, Section (a) of Public Law 212, 72d (47 Stat. 406), as amended, effective July 1, 1932 ("*inasmuch as* consultants do not occupy 'an office or position'… ." [emphasis added]); 38 C.F.R. § 3.800(a)(1) ("…*inasmuch as* concurrent payments are prohibited." [emphasis added.]); Executive Order 9690, 11 Fed.Reg. 1337 ( February 2, 1946) ("…inasmuch as I have found and determined…" [emphasis added]"). That neither Congress nor President Obama used the "inasmuch as" phrase confirms that neither believes that the US "participat[es]" in OHR, much less that such phantom "participation" is "authoriz[ed]" by Congress. The following discussion reinforces this interpretation.

29

      **iv.**    **The Fact That Neither The US Government Nor Defendants Recognize That The US "Participat[es]" In OHR Confirms That The Amendment Could Not Be Construed As "Authoriz[ation]" For Such Illusory "Participation"**

US participation in an international organization is required before IOIA immunity may be extended to it.  22 U.S.C. § 288; *see also Mendaro v. World Bank*, 717 F.2d 610, 615-616 (D.C. Cir. 1980); *International Refugee Organization v. Republic Steamship Co.*, 189 F.2d 858, 861(4th Cir. 1951); *Balfour, Guthrie & Co. v. United States*, 90 F.Supp. 831, 833 (N.D. Cal. 1950); *In re Hashim*, 188 B.R. 633, 645 (D. Ariz. 1995).

The US government does not recognize that the US "participat[es]" in OHR.  For instance, in *The United States Government Manual 2013*[43] ("Manual"), the US government's list of "other international organizations in which the United States participates" does not include OHR.[44]  *Id.*, at 533-535 (Zuza Decl., Ex. 14).

Defendants likewise do not recognize that the US "participat[es]" in OHR.  In the Sarkis District Court Action, OHR judicially admitted the fact that the US does not "participat[e]" in it.  *See* SoF, Conceded Fact 3 (and its "Related Facts"), *supra*.  OHR's judicial admissions are binding on Dr. Inzko and Lord Ashdown.  *See* footnote 13, *supra*. All three Defendants are, therefore, judicially estopped to argue the contrary in the

---

[43] Office of the Federal Register, National Archives and Records Administration, Revised July 1, 2013, ("US Manual").

[44] This introductory sentence of this section of the US Manual states:  "Below is a list of other international organizations in which the United States participates, but do not have separate entries in the Manual."  OHR has no "separate entr[y] elsewhere in the Manual." *See* Zuza Decl., ¶ 15 (link to the Manual).  Therefore, its absence from the list of "other international organizations in which the United States participates" confirms conclusively that the US government does not recognize that the US "participate[s]" in OHR.

present action. *Ibid*. Even if they were permitted to do so, the Motion cites no evidence

that the factual circumstances have changed since Defendants made the damaging

judicial admissions that the US does not participate in OHR.[45]

> **b.** **Even Assuming *Arguendo* That Defendants Satisfy The Congressional Action Requirement, They Would Still Fail To Prove Entitlement To IOIA Immunity, As They Do Not Satisfy The US Presence/Operations Requirement**

The Characteristics Prong requires an IOIA candidate organization to satisfy the

US Presence/Operations Requirement before it may be accorded immunity. *See*

*Mendaro*, *supra*, 717 F.2d at 615-616; *DeLuca v. United Nations*, 841 F.Supp. 531, 535-

536 (S.D.N.Y.1994); *In re Hashim*, *supra*, 188 B.R. at 645. Defendants agree. In fact, it

was OHR which first brought the US Presence/Operations Requirement to judicial

attention. *See* SoF, Conceded Fact 6 (and its "Related Facts"), *supra*. It did so in the

course of arguing: (1) that OHR does not satisfy this requirement; and (2) that,

consequently, the IOIA does not apply to OHR. *Ibid*. Circumstances have not changed

since these 2008 judicial admissions.[46] Defendants still do not satisfy US

Presence/Operations Requirement. They admit this on page 2 of the Motion. The

Amendment in no way vitiates the legal effect of this admission, *i.e.*, Defendants'

disqualification from the IOIA.

---

[45] Defendants may not introduce such evidence, if any, "for the time" in their "reply brief" at a time when Plaintiff would have no "opportunity for a written response." *Herbert*, *supra*, 974 F.2d at 196; *Flynn*, *supra*, 310 F.Supp.2d at 190.

[46] These judicial admissions by OHR are binding on Dr. Inzko and Lord Ashdown. *See* fn. 13, *supra*. All three Defendants are now judicially estopped to "back-track" from these admissions. *Ibid*.

When it enacted the Amendment, the 111th Congress is presumed to have been aware of the judicial interpretation of the IOIA enshrining the US Presence/Operations Requirement (as typified by the decisions cited above in this section).  *Lorillard v. Pons*, 434 U.S. 575, 581 (1978).  That the Amendment amended the existing IOIA rather than enact a new law conferring immunity on Defendants gives rise to the presumption that the 111th Congress incorporated in the 2010 Amendment this judicially-recognized requirement under the 1945 Parent Statute.  *Ibid.*

The IOIA itself makes pellucid that the immunity statutory scheme was intended strictly for international organizations *with offices, operations and staff in the US*.  *See* 22 U.S.C. §§ 288b (staff baggage exempted from US customs duties and IRS taxes), 288c (exemption from US property taxes); 288d (US-based staff immunity), 288e(b) (deportation from the US of organization's personnel), 288f (the impact of absence of reciprocity on US-based staff).

Defendants' concession that they have no "presence in the United States" (Motion, p. 2) confirms that they fail to satisfy the US Presence/Operations Requirement. *Mendaro*, *supra*, 717 F.2d at 615-616; *In re Hashim*, *supra*, 188 B.R. at 645; *DeLuca*, *supra*, 841 F.Supp. at 535-536.  This dispositive judicial admission demonstrates that Defendants do not qualify for IOIA immunity.  *Ibid.*

\\\\

\\\\

\\\\

### c. Failing to Satisfy The Congressional Action And The US Physical Presence Requirements, The EO May Not Serve As The Sole Basis For IOIA Immunity For Defendants

The discussion above demonstrates that Defendants fail to satisfy the Characteristics Prong.  Therefore, an examination of the Executive Order Prong would be superfluous – for, as the Parent Statute's conjunctive construction makes clear, an IOIA executive order has no legal force if a candidate organization fails to satisfy the Characteristics Prong.[47] *Schneider*, *supra*, 412 F.3d at 193-194; *see also Sanders*, *supra*, 985 A.2d at 442; *Lithium Corp.*, *supra*, 135 S.E.2d at 577.  Nevertheless, Plaintiff will show herein that the EO is as untenable as Defendants' claim that they have satisfied the Congressional Action Requirement.

First, Defendants have judicially:  (1) "consent[ed]" to the EO being disregarded; and (2) "conced[ed]" that it constitutes an abuse of executive discretion.  *See* SoF, Material Fact(s) 2 & fn. 23, *supra*.

Second, the objective facts discussed below confirm the EO should be disregarded.

Presidential executive action applying statutory criteria is subject to judicial review.  *See Mountain State Legal Foundation v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002); *see also Chamber of Commerce v. Reich*, 74 F.3d 1322, 1331 & 1337 (D.C. Cir. 1996) (Court declining "to conclude that there are no judicially enforceable limitations on presidential actions, besides actions that run afoul of the Constitution or which

---

[47] Defendants agree that the IOIA's Definitional Criteria is in the conjunctive.  Motion, pp. 9-10.

contravene direct statutory prohibitions, so long as the President *claims* that he is acting

pursuant to" a statutory directive [emphasis in original]), quoting *Stark v. Wickard*, 321

U.S. 288, 310 (1944) ("'[t]he responsibility of determining the limits of statutory grants

of authority ... is a judicial function entrusted to the courts by Congress....'").

President Obama abused his discretion when he issued the EO because, as shown

above, Defendants do not satisfy the Characteristics Prong.[48]   The EO does not find to the

contrary.  Indeed, it contains no specific findings showing that, prior to designating

Defendants as IOIA beneficiaries, President Obama even undertook the "due diligence"

exercise of applying the Characteristics Prong to Defendants.[49]   In failing to do so,

President Obama deviated from the custom and practice of his predecessors in the context

of the IOIA, as illustrated by the discussion of multiple IOIA executive orders in Section

IV.A.2.a.iii, *supra*.

Moreover, the laconic EO fails to give effect to Congressional intent.  The 79th

Congress, which enacted the IOIA in 1945, intended that the incumbent President should

apply the Characteristics Prong to candidate organizations.  *See* Parent Statute ("[a

candidate organization] shall have been designated by the President through appropriate

Executive order *as being entitled to enjoy* [IOIA immunity]" [emphasis added]).  OHR

---

[48] A copy of this Opposition, along with a cover letter explaining that the factual basis of the EO is being challenged herein by Plaintiff, has been served upon President Obama.  *See* Zuza Decl., ¶ 16.a.

[49] Had the executive branch even cursorily reviewed for OHR's compatibility with the Characteristics Prong, it would have discovered that OHR is *not* "entitled to enjoy" IOIA immunity, as shown above.  As the function of an IOIA executive order is to test for such "entitle[ment]" (*see* Parent Statute), President Obama failed, in the case of OHR, to discharge his Constitutionally-entrusted mandate.

has agreed that this was the intent behind the Parent Statute.[50]  Zuza Decl., Ex. 1, 12:8-9.

A contrary construction would render the Executive Order Prong in the Parent Statute

"superfluous", as Executive action would then serve no purpose.[51]  Such a construction is

prohibited.  *See Astoria Federal Savings & Loan Ass'n v. Solimino*, 501 U.S. 104, 112

(1991); *see also Sprietsma v. Mercury Marine*, 537 U.S. 51, 63 (2003).  There is nothing

in the Amendment to suggest that the 2010 legislation superseded this original intent

behind the 1945 Parent Statute.

As there are no specific findings in the EO, the reasonable inference is that

President Obama did not apply the Characteristics Prong to Defendants.  This inference is

reinforced by the contrast between the skeletal EO and the comprehensive executive

orders quoted in Section IV.A.2.a.iii, *supra*.  All of these IOIA executive orders are

predicated upon detailed Presidential findings that the Congressional Action Requirement

had been satisfied.

As shown above, OHR does not satisfy this requirement.  Accordingly, the EO is

the result of abuse of executive discretion, as Defendant have judicially admitted.[52]  *See*

---

[50] OHR's 2008 judicial admission is binding on Dr. Inzko and Lord Ashdown.  *See* fn. 13, *supra*.

[51] Plaintiff discerns no reason why the 79th Congress would codify the Executive Order Prong if
not to entrust the executive branch with the task of "vetting" a candidate organization for
compliance with the Characteristics Prong before designating it as an IOIA beneficiary.  Absent
such a limitation on Presidential discretion, the incumbent would be free to confer IOIA
immunity on anyone, including his own administration, political party, friends, family or, indeed,
himself.  Such an interpretation of the Executive Order Prong is prohibited, as it would lead to an
"absurd result."  *United States v. Granderson*, 511 U.S. 39, 47 n. 5 (1944).

[52] If, during the pendency of these proceedings, there is Congressional or Executive action to
cure the defects identified above through bespoke legislation and/or executive order, and if such

SoF, Material Fact(s) 2 & fn. 23, *supra*.  They have also judicially consented to it being

disregarded.  *Ibid.*

> ### d.   That Defendants Do Not Satisfy The IOIA's Definitional Criteria Is Confirmed By The Ninth Circuit's Elision Of Their IOIA Immunity Claim

*See* SoF, Material Fact(s) 1, *supra*.  By eliding Appellees' IOIA claim in 2011, the

Ninth Circuit branded Defendants' identical IOIA argument herein as a "difficult and

novel question" (*Ruhrgas A.G. v. Marathon Oil Company et al.,* 526 U.S. 574, 588

(1999)), one "not easily resolved."  *Cantor Fitzgerald, L.P. v. Peaslee*, 88 F.3d 152, 155

(2d Cir. 1996); *Browning-Ferris Indus. of S. Jersey, Inc. v. Muszynski,* 899 F.2d 151,

159-160 (2d Cir. 1990); *see also Can v. United States,* 14 F.3d 160, 162 n. 1 (2d Cir.

1994); *Bi v. Union Carbide Chemicals. & Plastics Co.,* 984 F.2d 582, 584 n. 2 (2d Cir.

1993).

Immunity claims are required to be "clear".  *Victory Transport*, *supra*, 336 F.2d at

360.[53]  The Ninth Circuit's circumvention of Defendants' IOIA claim confirms that their

immunity claim is far from "clear".  *Ruhrgas, supra*, 526 U.S. at 588; *Cantor Fitzgerald*,

---

governmental intervention on behalf of Defendants and targeting Plaintiff results in dismissal of Plaintiff's chose in action, liability for a taking and/or bill of attainder would arise.

[53] Although *Victory Transport* was a sovereign immunity case, its holding applies with equal force to an IOIA claim because the IOIA has been held to be analogous to the FSIA.  *See Nokalva*, *supra*, 617 F.3d at 762-765; *see also* Section III, *supra*.  By relying on FSIA precedents in the Motion (pp. 11-12), Defendants concede that certain of FSIA standards apply.  In any event, if Defendants' immunity claim is as clear as they contend, they should not object to the "clear case" standard of *Victory Transport*, which seems an eminently reasonable benchmark, particularly in the instant case where no alternative forum exists (a fact not disputed by Defendants).

*supra*, 88 F.3d at 155; *Browning-Ferris Indus., supra*, 899 F.2d at 159-160; *see also Can supra*, 14 F.3d at 162 n. 1; *Bi, supra*, 984 F.2d at 584 n. 2.  Said claim should, therefore, be rejected.  *Victory Transport, supra*, 336 F.2d at 360.  The Court should not blaze a trail through the legal thicket which the Ninth Circuit saw fit to bypass.

> **e.  That Defendants Do Not Satisfy The IOIA's Definitional Criteria Is Further Confirmed By Their Demonstrated Lack Of Confidence In Their IOIA Immunity Claim**

*See* SoF, Material Fact(s) 2-4, *supra*.

> **3.  *Defendants' Failure To Identify An Alternative Forum Further Militates Against Recognition Of Their IOIA Immunity Claim***

Defendants do not dispute the Complaint's allegation (¶ 51) that, if this action is dismissed, no other forum may offer Plaintiff redress.[54]  This allegation is, therefore, deemed true.  *Am. Nat'l Ins. Co., supra*, 642 F.3d at 1139.  The undisputed absence of an alternative forum underscores the fact that it would be unjust and inequitable to grant Defendants IOIA immunity, particularly as they have failed to prove entitlement thereto, as shown above.[55]

---

[54] Despite making a "passing reference" to forum non conveniens in a footnote, Defendants identify no alternative forum, as required by applicable law.  *See MBI Group, Inc. v. Credit Foncier du Camaroun et al.*, 616 F.3d 568, 571 (D.C. Cir. 2010).  In any event, there is a "substantial presumption" in favor of a plaintiff's chosen forum.  *Ibid.*

[55] Plaintiff anticipates that, in their Reply, Defendants will fall back on an *in terrorem* argument that, if they are denied immunity, their operations will be compromised.  Such a claim would be spurious.  First, there is no evidence to this effect in the record.  And Defendants may not introduce it "for the first time" in their Reply.  *Herbert, supra*, 974 F.2d at 196; *Flynn, supra*, 310 F.Supp.2d at 190.  Second, if the Motion is denied, it won't be the first time that a prominent "international organization" has been denied immunity *and* survived – indeed, thrived.  *See, e.g., Prewitt Enterprises, Inc. v. Organization of Petroleum Exporting Countries*, 353 F.3d 916, 922

**B.** **Even Assuming *Arguendo* That OHR Meets Its Burden Of Proving Entitlement To IOIA Immunity, Such Immunity Would Not Extend To Dr. Inzko Or Lord Ashdown**

Significantly, Defendants do not claim IOIA immunity for Dr. Inzko and Lord Ashdown under the "officers" and "employees" provisions of the Amendment and the EO.  They claim it instead under 22 U.S.C. §§ 288a(b)[56] & d(b).  Motion, p. 8. Defendants' legerdemain stems from two discomfiting realizations:  (1) that the Amendment and the EO address only *current* "officers" and "employees" of OHR, thus excluding the *former* HR Lord Ashdown; and (2) that Dr. Inzko is *not* an "officer" or "employee" of OHR.  Not being current OHR officers/employees, neither Dr. Inzko nor Lord Ashdown may claim to be current OHR "representatives" within the meaning of 22 U.S.C. § 288d(b).[57]

> *1.*     *HRs Are Not OHR "Officers"*

*See* SoF, Undisputed Facts 5-10 & Material Fact(s) 5, *supra*.  Defendants adduce no evidence to the contrary, least of all declarations from the incumbent HR Dr. Inzko – or anyone else from OHR, for that matter.  Even if such declarations were present, they would be contradicted by objective evidence.  For instance, there is no basis for

---

n.9 (11th Cir. 2003); *Hashim*, *supra*, 188 B.R. at 640, 645 (Arab Monetary Fund.  The Court should, therefore, dismiss Defendants' anticipated Jeremiads.

[56] Although why Defendants would cite Section 288a(b) remains a mystery, as it addresses exclusively the issue of "international organization[s']" property and assets.

[57] There is nothing in 22 U.S.C. 288d(b) to suggest that it applies to *former* "representatives", assuming Lord Ashdown was at one time a "representative" of OHR in the US (a false assumption, as shown below).

38

concluding that OHR possesses the separate corporate personality necessary to have corporate "officers".  *See* SoF, Undisputed Fact 3 (and its "Related Facts"), *supra*.  The record does not contain any OHR articles of incorporation or statute establishing OHR.[58]

Nor does the record disclose any alleged OHR "bylaws" listing its alleged "officer" or delegating authority to them – and for good reason:  none exist.  OHR's own counsel (Defendants' counsel herein) judicially admitted this in 2008.[59]  Zuza Decl., Ex. 2 (12/19/08 Hearing Transcript), 9:7-8 ("There are no bylaws.").  International organizations have bylaws, with specific provisions "delegate[ing] [ ] authority" from the

---

[58] The juridical personality of governmentally-sponsored domestic entities is typically established via legislatively-enacted charters.  *See* Zuza Decl., ¶ 18 (Fannie Mae Charter). Defendants cite no analogous Bosnian statute/charter creating OHR.  International corporate entities, on the other hand, are founded by treaties or ratified conventions.  *See*, *e.g.*, Executive Order 11966 of January 19, 1977, *supra*, noting that The International Centre for Settlement of In-vestment Disputes was established by the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States, which was ratified by the US Congress (17 U.S.T. 1270, T.I.A.S. 6090).  The GFAP is neither a treaty nor a ratified convention because, as Defendants agree (SoF, Undisputed Fact 1), it has never been ratified by the Bosnian parliament (or the US Congress, for that matter, because the US is not a party to the GFAP [SoF, Undisputed Fact 2, *supra*]).  As stated above, Defendants submit no evidence that an unratified Bosnian executive agreement has the force of law in Bosnia.  Even if the GFAP had been ratified, the document simply does not reference OHR as a duly-constituted organization. Defendants do not deny this.  *See* SoF, Undisputed Fact 4, *supra*.  It seems, therefore, that the only alleged source which Defendants identify as their constitutive instrument actually defeats their argument that OHR exists as a legal person capable of having "officers" or "employees".

[59] This judicial admission is binding on Defendants and activates judicial estoppel.  *See* fn. 13, *supra*.

"board of governors" to the "executive board."[60]  Defendants cite nothing analogous in the context of OHR.[61]

Additionally, HRs do not regard or present themselves as "officers" of OHR.  For instance, they do not style themselves in their official decrees and correspondence as "President" or some such corporate officer.  *See*, *e.g.*, Complaint, Ex.s A-B.  Heads of other international organizations typically use the corporate designation of "President" or, *e.g.*, "Under-secretary-General *of* the United Nations" (emphasis added) in their letterheads to show that they are "officers" *of* an organization and not freestanding.  *See*, *e.g.*, Zuza Decl., Ex 12.

HRs identify themselves as "High Representative for Bosnia and Herzegovina" only.  *See*, *e.g.*, Complaint, Ex.s A-B.  That no preposition "of" connects this title to an equally-absent reference to OHR suggests there is no legal obligation running from the HRs to OHR.  Even Defendants' counsel herein regards the HRs as "freestanding" and OHR as their instrumentality and/or alter ego.  Zuza Decl., Ex. 2, p. 9 (*e.g.*, "[OHR] is

---

[60] *See*, *e.g.*, Section 14 of the World Bank's bylaws; Section 15 of IMF's bylaws of the International Monetary Fund; and Articles 25-26 of the Constitution of International Committee of the Red Cross.  *See* Zuza Decl., ¶ 17 for relevant internet links.

[61] Defendants do not dispute the Complaint's allegation that (¶ 16) that PIC is a "political construct, not a legal entity", one "not referenced in any way in the GFAP", which Defendants claim as their constitutive instrument.  Therefore, the PIC may not be deemed a constituent part of OHR or a separate legal person.  In 2008, OHR and Mr. Lajcak did not dispute evidence in the Sarkis District Court Action that PIC has no juridical personality.  Zuza Decl., Ex. 3 (Sarkis Decl.), ¶ 15.  Additionally, Defendants do not dispute the Complaint's allegation (¶ 9) that HRs are "not legally accountable to any entity with a juridical personality."  On this record, PIC may not be considered OHR's "board of governors".  Without a "board of governors", there can be no "officers", who, as shown in the preceding footnote, derive their authority from delegating boards of stakeholders.

not a membership organization… .  It's literally the High Representative,… .")  He went

on to pose the question:  "Does that Representative fit the definition of an instrumentality

under the Foreign Sovereign Immunities Act?"  *Id.*, at lines 14-16.  Significantly,

Defendants' counsel herein, who claims the HRs are "officers" of OHR, did not in 2008

frame the question as "Does *OHR* fit the definition of an instrumentality … ?"[62]  Dr.

Inzko best captured the essence of the relationship between the HRs and OHR when he

referred to OHR as "my Office".  *See* Zuza Decl., Ex. 11 (Relevant pages from minutes

of the May 15, 2012 UNSC meeting), p. 3.  OHR is literally the HRs' staff or secretariat.

*See* SoF, Undisputed Fact 5 (and its "Related Facts"), *supra*.    .

   The plain fact is that HRs are superordinate to OHR, not subordinate to it.  They

cannot, therefore, be considered OHR "officers".[63]

### 2.   HRs Are Not OHR "Employees" Either

   It is settled law in the District of Columbia Circuit that the most important factor

in determining whether and employer-employee relationship exists is the "extent of the

employer's right to control the 'means and manner' of the worker's performance."

---

[62] These and other 2008 judicial admissions by Defendants' counsel herein are binding on
Defendants and activate judicial estoppel.  *See* fn. 13, *supra*.

[63] Even if the incumbent HR Dr. Inzko could do so, Lord Ashdown could not.  No longer HR, he
enjoys no alleged derivative immunity from the Amendment, EO or 22 U.S.C. § 288d(b).
Former HR Lord Ashdown is cited in the instant action in his personal capacity for the simple
reason that he no longer has an "official capacity" in which to be sued.  It is undisputed that it
was Lord Ashdown who removed Plaintiff from his civil service post (though Lord Ashdown's
successor-in-interest, Dr. Inzko, subsequently ratified, affirmed and adopted as his own his
predecessor's action).  *See* SoF, Undisputed Facts 12-14, *supra*.  Therefore, this action, which is
predicated on the Alien Tort Statute (28 U.S.C. § 1350), may be brought against Lord Ashdown
in his "personal capacity".  *See Samanter v. Yousuf*, 130 S.Ct. 2278, 2281 (2010).

*Spirides v. Rheinhardt*, 613 F.2d 826, 831 (D.C. Cir. 1979).  As shown above, it is the HRs who "control the means and manner of OHR's performance", not *vice versa*.  *See* SoF, Undisputed Facts 5-10 (and their "Related Facts"), *supra*.

Moreover, HRs claim the authority to "clos[e]"OHR.  Zuza Decl., Ex. 13 (October 15, 2008 OHR press release [third-from-the-bottom paragraph]).  Plaintiff is aware of no authority sanctioning the "closure" of a corporate "employer" by one of its "employees".[64]

Additionally, as shown above, Defendants have failed to show that OHR possesses the juridical personality necessary to enter into cognizable employment agreement with HRs such as Dr. Inzko and Lord Ashdown.  *See* SoF, Undisputed Fact 3 (and its "Related Facts"), *supra*.  Therefore, Dr. Inzko and Lord Ashdown, may not be classed as OHR "employees".  .

As the discussion above shows, even assuming *arguendo* OHR is accorded immunity, Defendants fail to meet their burden of showing that either Dr. Inzko or Lord Ashdown would be a derivative beneficiary of such immunity.  Accordingly, neither should be dismissed from this action.[65]

---

[64] It is noteworthy that, in its press release, OHR uses the word "closure", as opposed to "liquidation" which one would associate more with the legal winding-down of corporate entities.  "Closure", suggesting just turning off the lights and locking the doors, further confirms the *ad hoc* and nebulous nature of OHR.

[65] Defendants' reliance on 22 U.S.C. 288d(b) is all the more misplaced in that the plain meaning of the statutory term "representative" is one who "represents" the organization *in the US*.  This is confirmed by other provisions of the IOIA which show that the immunity statutory scheme was intended strictly for international organizations *with offices, operations and staff in the US*.  *See* 22 U.S.C. §§ 288b, 288c; 288d, 288e(b), 288f.  As shown elsewhere in this brief, OHR has

## IV.  CONCLUSION

For the above-stated reasons, the Motion should be denied.

Respectfully submitted,

By:  /s/ Zoran Zuza
Zoran Zuza
Zeljeznicka bb
71420 Pale
Bosnia & Herzegovina
zzuzzazoran@yahoo.com

Dated:  December 5, 2014                           *Pro Se* Plaintiff

---

admitted it has no presence in the US.  Therefore, it cannot claim to have "representatives" in this country enjoying immunity pursuant to 22 U.S.C. § 288d(b).

## CERTIFICATE OF SERVICE

I hereby certify that, on December 5, 2014, the foregoing *Pro Se* Plaintiff's

Memorandum in Opposition to Defendants' Motion to Dismiss, the Declaration of Zoran

Zuza, accompanying Exhibits and [proposed] Order were filed with the Clerk of the

Court via the CM/ECF system, causing said documents to be served on all counsel of

record for Defendants:


/s/ Zoran Zuza
Zoran Zuza